Ashlee B. Hesman, Bar No. 028874
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
ahesman@strucklove.com

*Attorney for Defendants Adams, Eccles,
Gallo, Lamb, Lizarraga, and York*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Changamu | CASE NO. 2:22-cv-01598-DGC-JFM |
| Plaintiff(s), | |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Pinal County Sheriff Mark Lamb; Sheriff Deputy R. Gallo #2230 and Spouse Gallo, husband and wife; Sheriff Deputy Eccles #1565 and Spouse Eccles, husband and wife; Lt. York and Spouse York, husband and wife, Deputy C. Lizarraga #2206 and Spouse Lizarranga, husband and wife; Sheriff Deputy J. Adams #2555 and Spouse Adams; and John Does and Jane Does I-X and Individuals/Entities I-X, | |
| Defendants(s). | |

Pursuant to Federal Rule of Civil Procedure 56 and LRCiv 56.1, Defendants move for summary judgment on the two counts in Plaintiff's First Amended Complaint ("FAC") (Dkt. 28).

## I.  Claims in Plaintiff's FAC.

In Count One, Plaintiff alleges that Defendants Gallo, Eccles, Lizarraga, Adams, and York used excessive force against him by restraining him, deploying a knee strike, tasering him, and utilizing the WRAP restraint system for his transport back to RRCC. (Dkt. 28 at 5–6.) In Count Two, Plaintiff brings a ratification *Monell* claim against Defendant York and Sheriff Lamb. (*Id*. at 6–7.) Plaintiff alleges that Sheriff Lamb and Defendant York "ratified the conduct of the [Defendants Gallo, Eccles, Lizarraga, and Adams] by taking no disciplinary action against them." (*Id*. at 7.) And that, by ratifying the conduct, Sheriff

Lamb "created a practice and procedure" that officers do not "have to follow policy and can take unauthorized actions with impunity" when using "excessive force" in similar situations. (*Id.*)

## II. Factual Background.

At all times relevant to the allegations in his FAC, Plaintiff was a sentenced Arizona Department of Corrections, Rehabilitation, & Reentry ("ADCRR") inmate who was serving a sentence at Red Rock Correctional Center ("RRCC") for aggravated assault.[1] *See* Defendants' Statement of Facts ("DSOF") at ¶ 1.) On July 26, 2021, Plaintiff was transported from RRCC to the Pinal County Superior Courthouse for a sentencing hearing on another aggravated assault conviction. (*Id.* at ¶ 3.) At approximately 8:00 a.m., Defendants Eccles and Gallo arrived at RRCC to transport Plaintiff to his hearing. (*Id.* at ¶ 4.) In preparation of the transport, Defendants Gallo and Eccles applied restraints to Plaintiff which included handcuffs, a belly chain, and a box. (*Id.* at ¶ 5.) The restraints were properly applied and not too tight. (*Id.* at ¶ 6.) In fact, Defendant Eccles confirmed there was enough room to move the handcuffs by slightly moving them up and down Plaintiff's wrists by one inch. (*Id.* at ¶ 7.) Defendant Eccles also explained to Plaintiff that keeping his handcuffs at the wrist would allow him the most comfort. (*Id.* at ¶ 8.) Moving them up his forearms, Defendant Eccles explained, would cause the handcuffs to feel tighter. (*Id.*) As such, Defendant Eccles instructed Plaintiff not to move the handcuffs. (*Id.*) While Plaintiff complained about having to be restrained with a box, he did not complain that his handcuffs were uncomfortable or too tight. (*Id.* at ¶ 9.) Defendant Eccles told Plaintiff to keep his handcuffs at his wrist, instead of moving them up his arm, for the most comfort. (*Id.*)

A "box" is a safety device that fits over handcuffs and protects the keyholes. (*Id.* at ¶ 10.) It prevents picking or tampering with any part of the handcuff lock or using a shim to open the handcuff. (*Id.*) The box allows connection to a security chain to restrict

---

[1] RRCC is owned and operated by CoreCivic pursuant to a contract with ADCRR. (*Id.* at ¶ 2.)

1  movement of the inmate's hands. (*Id*.) It is Pinal County practice to utilize a box when
2  transporting ADCRR inmates. (*Id*. at ¶ 11.) Indeed, Plaintiff had previously been restrained
3  using a black box. (*Id*. at ¶ 12.) After the restraints were applied, Plaintiff was transported
4  to court. (*Id*. at ¶ 14.) The drive from RRCC to the courthouse was approximately thirty
5  minutes. (*Id*. at ¶ 13.)

6  Just before Plaintiff entered the courtroom for his 10:00 a.m. sentencing hearing, his
7  criminal-defense attorney requested that Plaintiff's cuffs be loosened. (*Id*. at ¶ 15.) In
8  response, Defendants Gallo and Eccles "shimmied [the handcuffs] down because they were
9  up too high on his wrist," which was easily accomplished without the need to readjust
10 anything else. (*Id*. at ¶ 16.) Because Plaintiff's handcuffs were applied at his wrist prior to
11 transport, Plaintiff must have moved his handcuffs up his forearms during transport or upon
12 arrival at the courthouse. (*Id*. at ¶ 17.) In addition to moving the handcuffs from his upper
13 forearms back down to his wrists, Defendant Gallo inserted his pinky finger between
14 Plaintiff's wrist and handcuffs to confirm they were not too tight. (*Id*. at ¶ 18.) Thus, the
15 handcuffs did not need to be adjusted. (*Id*.) At 10:00 a.m., Plaintiff appeared for his
16 sentencing hearing and was sentenced to thirteen-and-a-half years in prison. (*Id*. at ¶ 19.)
17 Plaintiff was shocked and angry about the sentence he received. (*Id*. at ¶ 20.) Specifically,
18 he was concerned about his immigration status, that he had another felony conviction,
19 regarding his ability to get a job after his release and upset that the sentence would impact
20 his ability to see his daughter. (*Id*.) Defendants Eccles and Gallo were present for the
21 hearing, observed Plaintiff's reaction to his sentence, witnessed his demeanor change, and
22 saw that he became angry and upset. (*Id*. at ¶ 21.)

23 After the hearing concluded at approximately 11:00 a.m., Defendants Eccles and
24 Gallo escorted Plaintiff from the courtroom, down the elevator, and through the holding
25 cells outside of the Brown Mile.[2] (*Id*. at ¶ 22.) Plaintiff again complained about the box
26 but was informed that because he was an ADCRR inmate, the box was a mandatory safety

27
      [2] The "Brown Mile" is a covered outdoor hallway that connects PCADC to the
28 transportation sally port area. (*Id*. at ¶ 23.)

device required for his transport. (*Id*. at ¶ 24.) As Plaintiff exited the elevator on the ground floor, he walked in front of the transportation and abruptly sat on a chair between two cells. (*Id*. at ¶ 25.) He demanded a supervisor and stated he would not move until the box was removed. (*Id*. at ¶ 26.) Defendants Gallo and Eccles attempted to get ahold of a supervisor, but none were available. (*Id*.) Upon seeing Defendants Gallo and Eccles struggle with Plaintiff while he refused to get up from the chair, Defendant Lizarraga and Officer Abraham joined to assist them. (*Id*. at ¶ 27.) Assisted by Defendant Lizarraga and Officer Abraham, Defendants Eccles and Gallo picked Plaintiff up and escorted him through the Brown Mile to the transportation sally port to be transported back to RRCC. (*Id*. at ¶ 28.) Plaintiff refused directives and refused to walk. (*Id*. at ¶ 29.) During the escort, Defendant Gallo observed Plaintiff's handcuffs and confirmed they were not too tight and that his wrists were not swollen. (*Id*. at ¶ 30.)

As Plaintiff was escorted through the Brown Mile, he jumped up, raised his legs, attempted to sit on the ground, and landed on the floor. (*Id*. at ¶ 31.) In response, Defendant Lizarraga assisted Defendants Gallo and Eccles in picking Plaintiff up off the floor and bracing him against the wall. (*Id*. at ¶ 32.) Placing Plaintiff against the wall was necessary to regain control over him. (*Id*.) As Plaintiff struggled with them, Defendants told Plaintiff to cease his resistive and combative behavior, but Plaintiff ignored them. (*Id*. at ¶ 33.) When Plaintiff continued to struggle, Defendant Lizarraga delivered a single knee strike to the common peroneal area of Plaintiff's right leg. (*Id*. at ¶ 34.) This minimal use of force was successful and resulted in Plaintiff's compliance. (*Id*.) Defendants Lizarraga, Gallo, and Eccles continued with their escort until they arrived at the transportation sally port area. (*Id*. at ¶ 35.) Plaintiff's actions in the Brown Mile were captured on video. (*Id*. at ¶ 36.)

Once they arrived at the transport vehicle, Defendants Eccles and Gallo noticed that Plaintiff's handcuffs had again traveled up his forearm, so they readjusted them back down to his wrists, and placed him in the vehicle. (*Id*. at ¶ 37.) As they departed PCADC, Plaintiff began shouting profanities and threats at them because he was not provided his preferred restraints. (*Id*. at ¶ 38.) Once Defendant Eccles drove out of the transportation sallyport

toward East Diversion Dam Road, Plaintiff laid down on the seat, face up, and began kicking the rear driver side door and punching the vehicle's window. (*Id*. at ¶ 39.) Due to the safety and security concerns posed by continuing with the transport given Plaintiff's behavior, Defendant Eccles initiated an Incident Command System ("ICS") to request additional staff assistance and drove back to PCADC.[3] (*Id*. at ¶ 40.) The ICS was broadcast in the intake sally port, and advised there was a combative inmate inside a transportation vehicle. (*Id*. at ¶ 42.)

Multiple medical and detention staff responded to the ICS, including Defendants Adams and York. (*Id*. at ¶ 43.) Defendant Eccles briefed Defendant York on Plaintiff's behavior. (*Id*. at ¶ 44.) When the transport vehicle returned to PCADC's sallyport, Defendant York approached the vehicle and heard Plaintiff yelling and saw him kicking the door of the transportation vehicle. (*Id*. at ¶ 45.) Plaintiff was kicking the door so hard that it was visibly moving. (*Id*.) Defendant York attempted to speak to Plaintiff, but Plaintiff continued to yell, and refused to listen or comply with Defendant York's directives to stop his combative behavior. (*Id*. at ¶ 46.)

Plaintiff told Defendant York he wanted the black box removed because it restricted his movement, Plaintiff did not mention his handcuffs, nor did he complain that they were too tight. (*Id*. at ¶ 47.) Defendant York explained to Plaintiff that the black box could not be removed, but Plaintiff continued to yell and disregard Defendant York's directives to cease his combative behavior. (*Id*. at ¶ 48.) Defendant York was concerned that Plaintiff was going to hurt himself, an officer, break a window, or damage the transportation vehicle. (*Id*. at ¶ 49.) As such, Defendant York directed officers to utilize the WRAP restraint system for Plaintiff's transport back to RRCC.[4] (*Id*.) Officers' attempts to place Plaintiff

---

[3] An ICS is a protocol officers may utilize to request additional resources and assistance to respond to an event. (*Id*. at ¶ 41.) Here, the ICS was requested via radio, and broadcast to master control so that it could be relayed to the rest of the facility. (*Id*.)

[4] A WRAP is a system of restraint which limits a person's capability to harm themselves or others. (*Id*. at ¶ 50.)

in the WRAP, and the subsequent events which are described below, were captured on video. (*Id*. at ¶ 51.)

Defendant York directed the officers to remove Plaintiff from the vehicle and apply the WRAP. (*Id*. at ¶ 52.) Once out of the vehicle, officers laid Plaintiff onto the ground and attempted to apply the WRAP system. (*Id*. at ¶¶ 53.) For safety and security purposes, given Plaintiff's earlier behavior, Defendant Adams drew his county-issued taser and placed it on Plaintiff's shoulder area. (*Id*. at ¶ 54.) Once Plaintiff was placed on his stomach, he was directed not to move. (*Id*. at ¶ 55.) In defiance of officers' orders, and without warning, Plaintiff then slammed his head into the concrete ground. (*Id*. at ¶ 56.) Defendant Adams decided that use of taser in drive-stun mode was the most effective and safest means of stopping Plaintiff's self-harm and gaining control of him so that the WRAP device could be applied, particularly given his knowledge that Plaintiff had been self-harming and combative while inside the transportation vehicle, which required officers to turn around and drive back to PCADC for their and Plaintiff's safety. (*Id*. at ¶ 57.) In response, Defendant Adams deployed a very brief (less than two second) single taser contact drive stun to Plaintiff's upper left shoulder to distract him and stop him from continuing his self-injurious behavior. (*Id*. at ¶ 58.) Once Defendant Adams applied the taser, Plaintiff stopped resisting, complied with the officers' directions, and they were able to proceed with the application of the WRAP restraint. (*Id*. at ¶ 59.) After less than a two-second deployment, Defendant Adams released the taser. (*Id*. at ¶ 60.) During his act of self-harm, Plaintiff stated "just kill me," or words to that effect. (*Id*. at ¶ 61.) Once they gained compliance, officers completed the WRAP's application and Plaintiff was transported back to RRCC. (*Id*. at ¶ 62.)

Upon arrival at RRCC, photographs of Plaintiff were taken. (*Id*. at ¶ 63.) The marks on Plaintiff's wrists were consistent with marks typically seen when inmates move or manipulate handcuffs by moving them up and down their forearms. (*Id*. at ¶ 64.) Moving the handcuffs down the forearm to the wrists would make them looser at the wrist than they

were at the forearm. (*Id*.) When Plaintiff arrived back at RRCC, he was provided with ice and ibuprofen, and sent back to his housing unit. (*Id*. at ¶ 65.)

### III. Legal Standard

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### IV. Legal Argument

#### A. Plaintiff Cannot Bring Fourteenth Amendment Claims.

While the Fourteenth Amendment protects pretrial detainees from excessive force amounting to punishment, *Kingsley v. Hendrickson*, 576 U.S. 389, 397-98 (2015) (citing *Graham v. Connor,* 490 U.S. 386, 395 n.10 (1989), convicted and sentenced inmates are protected from the use of excessive force pursuant to the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992). Here, Plaintiff was a convicted ADCRR inmate serving prison time for aggravated assault at all times relevant to the allegations in his FAC. As such, the Eighth (not the Fourteenth) Amendment applies to his claim. Plaintiff's Fourteenth Amendment claims should be dismissed.

#### B. Officer Defendants are Entitled to Summary Judgment on Plaintiff's Eighth Amendment Claim (Count One).

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. McMillian*, 503

U.S. 1 (1992)). There is no respondeat superior liability under § 1983 and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992). Plaintiff must demonstrate each defendant personally participated in the deprivation of Plaintiff's rights, *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002), and show an affirmative link between his alleged injury and defendants' conduct. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

The core judicial inquiry in an inmate's Eighth Amendment excessive force claim against a jail official is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *see also Hudson*, 503 U.S. at 6–7. An excessive force inquiry requires subjective and objective components—whether the defendant acted with a sufficiently culpable state of mind and whether the conduct was objectively harmful enough to establish a constitutional violation. *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (citing *Hudson*, 503 U.S. at 8). The objective component is contextual and responsive to "contemporary standards of decency." *Hudson*, 503 U.S. at 8.

To prove the subjective component, plaintiff must prove that each defendant "acted in bad faith with the intent to harm" him. *Hoard v. Hartman*, 904 F.3d 780, 790 (9th Cir. 2018); *see also Whitley*, 475 U.S. at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]"). This heightened standard requires a showing of "purposeful or knowing conduct." *Porter v. Nussle*, 534 U.S. 516, 528 (2002); *see also Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002) (finding excessive force requires a "more culpable mental state" than that required for excessive force claims arising under the Fourth Amendment). A finding of negligence, deliberate indifference, or even that the force used was objectively unreasonable in and of itself, is not enough. *Porter*, 534 U.S. at 528; *Clement*, 298 F.3d at

903. The "malicious and sadistic" standard, as opposed to the "deliberate indifference" standard applicable to most Eighth Amendment claims, is applied to excessive force claims because prison officials generally do not have time to reflect on their actions in the face of risk of injury to inmates or prison employees. *Whitley*, 475 U.S. at 320-21

Courts apply a five-factor test to determine whether the use of force was malicious and sadistic: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013). Finally, because the use of force relates to the prison's legitimate penological interest in maintaining security and order, the Court must be deferential to the conduct of prison officials. *See Whitley*, 475 U.S. at 321–22. In undertaking this analysis, the court should afford prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson*, 503 U.S. at 6. "[G]iven the latitude prison officials are given when crafting and applying policies, compliance with a policy is evidence of compliance with the Eighth Amendment's requirements." *Martin v. Dewsnup*, No. 6:11-CV-06420-AC, 2015 WL 13730889, at *13 (D. Or. Dec. 30, 2015).

As detailed below, Defendants retained Mr. Ken Wallentine to review and render opinions regarding their use of force. (DSOF at ¶ 66.) Mr. Wallentine is a police-procedures/use-of-force expert with over forty years' experience. (*Id*.) He is currently the Chief of the West Jordan Police Department, where he oversees all police operations and investigations. (*Id*.) In addition to his primary employment, he routinely consults and provides expert witness opinions on police procedures and use-of-force issues. (*Id*.) He is also the author of numerous model policies for law enforcement agencies and has provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. (*Id*.) He also served as a contract consultant to the United States Department of Justice, assigned to provide technical

assistance and management consulting to various public safety entities in the United States. (*Id.*) As detailed below, it is his opinion that each use of force was justified, consistent with accepted corrections and law enforcement policies, practices, and training, and complied with the standard of care. Mr. Wallentine's opinions are particularly compelling here, where Plaintiff has no expert opinion to support his claims.

### 1. Restraint Application (Defendants Gallo & Eccles)

Turning to the first factor, Plaintiff's injury consisted of temporary red markings and mild swelling around his wrists and forearm during the brief few hours he was in restraints. These injuries are not severe enough to satisfy the objective prong of the Eighth Amendment analysis. *See, Williamson v. City of National City*, 23 F.4th 1146, 1152 (9th Cir. 2022) (holding that the "intrusion at issue was minimal" despite the plaintiff suffering a torn rotator cuff, a sprained wrist, and mild swelling).[5] Indeed, photographs of Plaintiff's wrists show no evidence that the handcuffs were applied too tightly, and instead reveal only temporary marks which were caused by Plaintiff's manipulation of the handcuffs, despite repeated instruction not to move them up his arms. (DSOF at ¶ 70.)

With respect to the remaining proportionality factors, it was necessary to restrain Plaintiff with handcuffs and a box as he was a sentenced inmate from a different agency that PCSO had not performed a security clearance on. (*Id*. at ¶ 48.) Moreover, he was being transported outside of a secure correctional facility through public space. (*Id.*) Indeed, Mr. Wallentine opines that the restraints utilized to transport Plaintiff was consistent with accepted corrections and law enforcement policies, practices, and training, and complied

---

[5] Other courts have reached the same conclusion. *See e.g.*, *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (injury insufficient to support an Eighth Amendment excessive force claim where the only evidence in the record was that handcuffs left red marks "visible for days"); *Fears v. Beard*, 2012 WL 5905061, at *4-5 (W.D. Pa. Nov. 2, 2012) (granting summary judgment on Eighth Amendment excessive force claim where prisoner suffered two small abrasions and noting that "[h]andcuffing inevitably involves some use of force, and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs were applied") (internal citation and quotation marks omitted); *Weatherly v. Wade*, 2009 WL 513982, at *5 (S.D. Tex. Mar. 2, 2009) (granting summary judgment in Eighth Amendment excessive force case where hand restraints were tight enough to cause superficial bruising and abrasions to plaintiff's wrists but were not so tight that they caused a physical injury to plaintiff's bones, soft tissue, or nerves).

with the standard of care. (*Id*. at ¶¶ 67–80, 116–118.)   Additionally, he opines that they were properly applied, did not pose a risk of injury, and did not cause Plaintiff to be injured. (*Id*.)

Defendant Gallo and Eccles' application of the restraints was not done in bad faith nor with the intent to harm Plaintiff. Rather, they were following well-reasoned PCSO practices regarding the transportation of sentenced inmates from other agencies. When Plaintiff requested adjustments, they made them, by returning his handcuffs back to his wrists after he moved them up despite their instructions not to. They are entitled to summary judgment.

### 2. Placement of Plaintiff Against Wall (Defendants Gallo & Eccles).

As the video confirms, Plaintiff suffered no injury as a result of his placement against the wall in the Brown Mile. (*Id*. at ¶ 36.)   It was necessary for Defendants Gallo and Eccles to place Plaintiff against the wall, however, as he jumped, kicked his feet up, and attempted to sit on the ground, just as he had done on the green chair outside of the transportation cells. (*Id*. at ¶ 19.) Defendants Gallo and Eccles did not slam Plaintiff against the wall. (*Id*. at ¶ 83.) Rather, they placed him against the wall in a necessary and justified effort to regain control and compliance over Plaintiff after he jumped and dropped to the floor. (*Id*. at ¶¶ 19, 83.)  These Defendants' previous efforts to gain compliance with Plaintiff through verbal requests were unsuccessful. (*Id*.)  Thus, the proportionality factors weigh in Defendants' favor. Defendants Gallo and Eccles placed Plaintiff against the wall to maintain and restore discipline, and ensure the safety of Plaintiff and PCADC staff, not to cause Plaintiff harm. (*Id*.)  In Mr. Wallentine's opinion, this placement was a necessary and justified effort to regain control and compliance of Plaintiff. (*Id*. at ¶¶ 19, 82–83.) Defendants' Eccles and Gallo's placement of Plaintiff against the wall was done to restore discipline and not to harm Plaintiff. (*Id*. at ¶ 119.)

### 3. Knee Strike (Defendant Lizarraga)

First, other than Plaintiff's claim that his back hurt, there is no evidence that Plaintiff suffered any injury as a result of the knee strike. (*Id*. at ¶ 120.)   For the same reasons

11

1   detailed under Section IV(c)(2) *supra*, the knee strike was necessary to regain control of
2   Plaintiff after he jumped and attempted to sit in the Brown Mile. (*Id*.) Defendant Lizarraga
3   deployed the knee strike, as Plaintiff posed a threat to the safety of the other officers and
4   others he may have encountered if he broke free from the escort hold. (*Id*.) Due to the great
5   risks associated with Plaintiff's potential escape and the other risks identified above,
6   Defendant Lizarraga elected to only execute a knee strike, despite that more significant
7   levels of force were available to him. (*Id*.) Defendant Lizarraga only used minimal force
8   in a good faith effort to regain control of Plaintiff and he stopped the force as soon as
9   Plaintiff complied. (*Id*.) Thus, the proportionality factors weigh in his favor. In Mr.
10  Wallentine's professional opinion, Defendant Lizarraga's delivery of a knee strike to
11  control Plaintiff was reasonable, consistent with accepted law enforcement policies,
12  practices, and training, and complied with the standard of care. (*Id*. at ¶¶ 86–90.)

### 4. Decision to Use WRAP Restraint Device (Defendant York)

As an initial matter, Count One should be dismissed against Defendant York because Plaintiff conceded in his deposition that he was not alleging Defendant York used excessive force against him. (*Id*. at ¶ 121.) To the extent Plaintiff claims Defendant York's decision to order Plaintiff be transported in the WRAP device, that claim fails. First, Plaintiff suffered no injury as a result of being transported in the WRAP device. (*Id*. at ¶¶ 86–90.) Regarding the proportionality factors, the WRAP device was necessary due to Plaintiff's combative behavior inside the transportation vehicle, which posed a risk to his safety and the safety of the officers. (*Id*. at ¶¶ 86–90, 122.) Defendants attempted to transport Plaintiff in regular restraints, but he repeatedly kicked his feet against the vehicle door/window to get it open, which required Defendants Gallo and Eccles to return to PCADC for their safety. (*Id*. at ¶ 123.)

In Mr. Wallentine's professional opinion, Defendant York's decision to utilize a WRAP restraint device for Plaintiff's transport from PCADC to RRCC was reasonable, consistent with accepted law enforcement policies, practices, and training, and complied with the standard of care. (*Id*. at ¶¶ 104–115.) Specifically, Mr. Wallentine opines that

Plaintiff's actions, including struggling against Defendants Eccles, Gallo, Lizarraga, and Officer Abraham as they escorted him in the Brown Mile, and hitting the window and kicking the door of the transport vehicle, would prompt a reasonable and well-trained officer, knowledgeable in the use of the WRAP restraint device, to use the device to control Plaintiff for transport. (*Id.*) This decision was made to ensure officers' and Plaintiff's safety, not to harm Plaintiff. (*Id.*)

### 5. Less Than Two-Second Drive Stun (Defendant Adams).

As detailed above, in response to Plaintiff's decision to strike his head against the pavement against commands not to move, Defendant Adams deployed a very brief (less than two second) single taser contact drive stun to Plaintiff's upper left shoulder to distract him and to stop him from banging his head. (*Id.* at ¶ 58.) This was necessary to prevent any additional self-harm by Plaintiff, and to stop the threat he posed. (*Id.*) For example, Plaintiff could have kicked or headbutted officers, which may have required higher levels of force to stop. (*Id.*) Indeed, Plaintiff was headbutting, punching, and kicking the interior of the transportation vehicle while more securely restrained with a black box, which had been removed prior to the tasing. (*Id.*) Further, he could have continued to slam his head into the ground which could have resulted in significant injury or even death. (*Id.*) Defendant Adams only used the level of force that was reasonably necessary to stop the threat Plaintiff posed. (*Id.*) Defendant Adams did not use force maliciously or sadistically to cause Plaintiff harm. (*Id.*)

In Mr. Wallentine's professional opinion, Defendant Adams' brief taser deployment was reasonable, consistent with accepted law enforcement policies, practices, and training, and complied with the standard of care. (*Id.* at ¶¶ 91–103.) As described above, during the initial attempt to transport Plaintiff back to RRCC from PCADC, Plaintiff kicked and punched the doors and windows of the transport vehicle, requiring Defendants Eccles and Gallo to return to PCADC to seek assistance. (*Id.* at ¶ 92.) When Plaintiff was removed from the transport vehicle and placed onto the ground, he engaged in serious self-harming behavior by violently striking his head on the concrete, injuring himself and saying, "just

1    kill me." (*Id.* at ¶ 93.)  Officers reasonably perceived that Plaintiff was trying to harm
2    himself. (*Id.* at ¶ 95.)  The taser usage log indicates that energy was delivered for just under
3    1.65 seconds. (*Id.* at ¶ 96.)  The very brief deployment was successful as Plaintiff stopped
4    his self-harming behavior. (*Id.* at ¶ 97.)

5          Application of a taser in "drive-stun" mode involves placing the fore end of the
6    device on the subject's body and activating the device with a trigger press. (*Id.* at ¶ 99.)
7    This mode does not require a probe to be attached to the subject. Activation causes a mild
8    electrical current to pass between two electrodes on the end of the device. (*Id.*)  The average
9    current delivered by a taser in drive-stun mode is 1.5 mA, or 0.0015 amperes, or a tiny
10   fraction of the amperage required to power just one single miniature holiday tree bulb. (*Id.*
11   at ¶ 100.)    The drive-stun mode is used for "pain compliance," intended to induce a subject
12   to submit to an officer's directions and to distract the subject from persisting with
13   aggression and/or resistance to custody. (*Id.* at ¶ 101.)  When deployed in drive-stun mode,
14   there is no neuromuscular incapacitation. (*Id.*)  Once Defendant Adams applied the taser
15   for less than two seconds, Plaintiff stopped trying to harm himself. (*Id.* at ¶ 102.)  He ceased
16   resisting and complied with the officers' directions. (*Id.*)    Use of the taser in drive-stun
17   mode was a reasonable option to distract and control Plaintiff in the particular
18   circumstances. (*Id.* at ¶ 103.)

19         Deploying a taser in drive-stun mode briefly to distract Plaintiff and to prevent him
20   from harming himself (or others) was consistent with accepted law enforcement policies,
21   practices, and training. (*Id.*)  Indeed, courts have found that deployment of a taser in the
22   harsher dart-mode insignificant to sustain an Eighth Amendment violation. *See Cutler v.*
23   *Kootenai Cnty. Sheriff's Dep't*, No. CV-08-193-N-EJL, 2010 WL 2000042, at *6 (D. Idaho
24   May 19, 2010) (granting summary judgment to defendants on plaintiff's Eighth
25   Amendment excessive force claim where plaintiff was tasered in dart-mode during an
26   altercation between him and another inmate). Defendant Adams is entitled to summary
27   judgment because the undisputed facts demonstrate that they used the taser "to enforce
28

discipline and security" and not "for the sole purpose of punishment or the infliction of pain." *Michenfelder v. Sumner*, 860 F.2d 328, 336 (9th Cir.1988).

Each use of force discussed herein was applied to restore discipline and was done so using only the minimal force necessary to establish compliance and regain order. (DSOF at ¶¶ 116.) Likewise, each use of force discussed herein was consistent with Pinal County use of force policy, practice, and procedure. (*Id*. at ¶ 117.) Based on the accounts of the incident and based upon the collective data available to Mr. Wallentine, it is his opinion that Defendants complied with the standard of care and acted consistently with the actions of reasonable and properly trained law enforcement officers and police practices as commonly taught to and practiced by law enforcement and corrections officers. (*Id*. at ¶ 118.)

### C. Defendant York & Sheriff Lamb are Entitled to Summary Judgment on Plaintiff's *Monell* Claims (Count Two).

As a threshold matter, for *Monell* liability to attach, Plaintiff must first establish that the officer Defendants violated Plaintiff's constitutional rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (emphasis in original)); *see also Rosalia v. City of Hayward*, No. 22-16135, 2023 WL 5842308 at *2 (9th Cir. Sept. 11, 2023) ("There can be no *Monell* liability if there is no underlying violation of a constitutional right."). Because there was no constitutional violation, Plaintiff cannot proceed on his *Monell* claims. Even if he could establish an underlying constitutional violation (he cannot), Defendant York and Sheriff Lamb are entitled to summary judgment.

To establish *Monell* liability, Plaintiff must "prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Dougherty*

*v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432 (9th Cir. 1997)). Plaintiff cannot rely merely on a theory of *respondeat superior*. *Monell*, 436 U.S. at 690. When a government official causes a constitutional violation, a plaintiff can prove the existence of a policy or custom on any of three theories: (1) that the official acted pursuant to expressly adopted official policy; (2) that the official's conduct was a product of the local entity's deficient practices or customs, such as failing to train or supervise; or (3) that the official had "final policy-making authority" or "ratified a subordinate's unconstitutional decision or action and the basis for it." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (internal quotations omitted).

To prove *Monell* liability under a ratification theory, Plaintiff must show that "a policymaker approve[d] a subordinate's decision and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (emphasis in original). "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). Additionally, ratification requires "something more than the failure to reprimand." *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1190 (D. Haw. 2003).

First, Plaintiff's ratification claim against Defendant York must be dismissed because he is not a final policymaker. (DSOF at ¶ 124.) Even if he were, he and Sheriff Lamb are entitled to summary judgment on Plaintiff's ratification claim because Plaintiff has no evidence that either of them approved the Officer Defendants' decision or the basis for it. That they were not disciplined, without more, particularly where their conduct complied with Pinal County policy and the standard of care, is insufficient. "The law does not say that every failure to discipline an officer . . . is evidence of a 'whitewash' policy or some other policy of 'sham' investigations, or that a failure to discipline an officer in one instance otherwise establishes a policy for which a city may be held liable under § 1983." *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003). Plaintiff has no evidence of the "something more" required by Ninth Circuit case law. Defendant York and Sheriff Lamb are entitled to summary judgment.

Likewise, Sheriff Lamb is entitled to summary judgment on Plaintiff's claim that he created a policy that officers may use excessive force in cases like those presented here, "do not have to follow policy," and "can take unauthorized actions with impunity." (Dkt. 28 at 7.) Plaintiff has no evidence of such a policy, no evidence that it was widespread and so well settled as to constitute a custom or usage, and no evidence that it was the moving force. Defendant York and Sheriff Lamb are entitled to summary judgment on Count Two.

### D. Defendants Gallo, Eccles, Lizarraga, York, & Adams are Entitled to Qualified Immunity.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"). To overcome a claim of immunity, plaintiff must establish "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735. Plaintiff "bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000)). A right is "clearly established" when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (cleaned up).

As detailed above, Plaintiff cannot establish that Defendants Gallo, York, Eccles, Lizarraga, or Adams violated any of his constitutional rights. Even if he could, however, there is no case law to suggest that Defendants violated a clearly established right. Where the events are captured on video, as is the case here, the Court must view the facts in the

light depicted by the videotape. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). These Defendants are therefore entitled to qualified immunity.

### E. Defendants are Entitled to Summary Judgment on Plaintiff's Punitive Damages Claim.

Punitive damages are only available in § 1983 claims where the plaintiff can establish that the conduct at issue "'is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Dubner v. City and County of San Francisco*, 266 F.3d 959, 969 (9th Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Here, there is no evidence that any of the Defendants' conduct was motivated by evil motive or intent or that it involved reckless or callous indifference to Plaintiff's rights. To the contrary, as detailed above, Defendants did not violate Plaintiff's constitutional rights.

### V. Conclusion

For these reasons, Defendants are entitled to summary judgment.

DATED this 3rd day of April 2024.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Ashlee B. Hesman
Ashlee B. Hesman
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorney for Defendants Adams, Eccles, Gallo, Lamb, Lizarraga, and York*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Keith M. Knowlton          keithknowlton@msn.com

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

/s/ Ashlee B. Hesman