JDN

**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT**

**OF ARIZONA**

| | |
|---|---|
| Richard Changamu, | No.   CV-22-01598-PHX-DGC (JFM) |
| Plaintiff, | |
| vs. | **ORDER** |
| Pinal County Sheriff Mark Lamb, et al., | |
| Defendants. | |

Plaintiff Richard Changamu, through counsel, brought this civil rights action under 42 U.S.C. § 1983 against four Pinal County Sheriff's Office Deputies: R. Gallo, Eccles, C. Lizarranga, and J. Adams.  (Doc. 28.)[1]  Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 72).  The Court will grant the Motion in part and deny it in part.

**I.      Background**

Plaintiff's claims arose on July 26, 2021, when he was transferred from the Red Rock Correctional Center (RRCC), where he was housed, to and from the Pinal County Superior Court, where he had a sentencing hearing.  (Doc. 28 ¶ 12.)  Plaintiff alleges that Defendants Gallo and Eccles applied extremely tight handcuffs that caused Plaintiff's hands to swell and refused to loosen the handcuffs after requests by Plaintiff and his lawyer.

---

[1]Plaintiff initiated this action in state court and Defendants removed it to federal court.  (Doc. 1, Pinal County Superior Court No. S1100CV202201111.)

(*Id.* ¶¶ 13–18.)  Plaintiff states that after the sentencing hearing, Defendants Gallo, Eccles, and Lizarranga escorted Plaintiff to the "Brown Mile"—the brown hallway connecting superior court and the Pinal County Sheriff's Office (PCSO) jail.   (*Id.* ¶¶ 23–24.) According to Plaintiff, while walking down this hallway, Defendants Gallo and Eccles slammed Plaintiff against the wall and Defendant Lizarranga kneed his lower spine.  (*Id.* ¶¶ 24–25.)  Plaintiff alleges that after he was placed in the transport van and it started to drive back to the RRCC, Defendants returned to the PCSO sally port where over ten officers under the supervision of Defendant York were waiting for them.  (*Id.* ¶¶ 27, 29– 30.)  Plaintiff asked to speak to Defendant York, but York told him he did not care what Plaintiff had to say and ordered Plaintiff out of the vehicle.  (*Id.* ¶¶ 31–32.)  Plaintiff was ordered to get on his knees and then his stomach.  (*Id.* ¶¶ 34–35.)  Plaintiff complied with all directives, but Defendant Adams nonetheless deployed a taser in drive-stun mode on Plaintiff's back, causing very painful electric shocks.  (*Id.* ¶¶ 35–37.)

Plaintiff asserts excessive force claims against Defendants Gallo, Eccles, Lizarranga, and Adams.  (*Id.* ¶¶ 40–49.)

Defendants move for summary judgment on the grounds that (1) Defendants Gallo and Eccles' use of handcuffs did not violate the Eighth Amendment, (2) Defendants Gallo and Eccles' placement of Plaintiff against the wall did not violate the Eighth Amendment, (3) Defendant Lizarranga's knee strike did not violate the Eighth Amendment, (4) Defendant Adams' use of the stun gun taser did not violate the Eighth Amendment, (5) Defendants are entitled to qualified immunity, and (6) punitive damages are not warranted.  (Doc. 72.)[2]

/ / /

---

[2] Defendants also argue that Defendant York's use of a WRAP restraint device did not violate the Eighth Amendment, and that Plaintiff cannot support *Monell* claims against Defendants Lamb and York.  (Doc. 72 at 12.)  Plaintiff's Complaint did not raise any claim related to the use of the WRAP restraint.  (*See* Doc. 28.)  After Defendants filed their Motion for Summary Judgment, the parties stipulated to dismissal of the *Monell* claims against Defendants Lamb and York, and both these Defendants were dismissed.  (Docs. 84, 86.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to show the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law), and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant).  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968), but it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  The court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## III.    Facts

As stated, where the parties' versions of events differ, the Court takes Plaintiff's facts as true.  *See Anderson*, 477 U.S. at 255.  In this case, there is also video footage of the incidents giving rise to Plaintiff's excessive force claims.  (*See* Doc. 73-2, Ex. 4, Attach.

B & Ex. 6, Attach. B, Videos.)  The Court considers the facts in the light depicted by the videos, but still draws all inferences from the videos in Plaintiff's favor.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).[3]

Plaintiff was a prisoner housed at the RRCC.  (Doc. 73 ¶ 1; Doc. 82 ¶ 1.)  On July 26, 2021, at 8:00 a.m., Defendants Gallo and Eccles arrived at the RRCC to transfer Plaintiff to the Pinal County Superior Courthouse for sentencing.  (Doc. 73 ¶¶ 3–4; Doc. 82 ¶¶ 3–4.)  Defendants Gallo and Eccles placed Plaintiff in restraints, including handcuffs, a belly chain, shackles on his feet, and a black box that is placed over the handcuffs so that the lock on the handcuffs cannot be picked.  (Doc. 73 ¶ 5; Doc. 82 ¶ 5.)  The black box connects to the security chain to restrict movement of a prisoner's hands.  (Doc. 73 ¶ 10; Doc. 82 ¶ 10.)  The parties dispute whether, when the handcuffs were placed on Plaintiff, Defendant Eccles told Plaintiff that keeping his handcuffs at the wrist would allow the most comfort, and moving the handcuffs up his forearms would cause the handcuffs to feel tighter.  (Doc. 73 ¶ 8; Doc. 82 ¶ 8.)  Plaintiff denies that Defendant Eccles ever made this statement to him.  (Doc. 82 ¶ 8.)

---

[3] In his Controverting Statement of Facts, Plaintiff objects to many of the assertions set forth in Defendants' Statement of Facts. (*See* Doc. 82 ¶¶ 68, 71–79, 81, 102, 107, 117–118.)  Many of Plaintiff's objections are to the opinion testimony from Defendants' expert, Ken Wallentine, a police-procedure/use-of-force expert. (*See id.*; Doc. 73 ¶ 66.)  Much of Mr. Wallentine's opinion testimony is irrelevant or conclusory. (*See* Doc. 82 ¶¶ 68, 71–79, 81, 102, 107, 117–118.)  The Court considers only relevant evidence in its summary judgment ruling.  *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Thus, the Court will address an objection to an asserted fact only if that fact is considered in the summary judgment analysis.

After the transport vehicle departed the RRCC, Plaintiff was trying to get comfortable with the handcuffs, but they were very tight.  (*Id.* ¶ 6.)  Plaintiff asked Defendants Gallo and Eccles if they could loosen the cuffs when they arrived at the courthouse.  (*Id.*)  The drive to the courthouse was approximately 30 minutes.  (Doc. 73 ¶ 13; Doc. 82 ¶ 13.)

When they arrived at the courthouse and before Defendants Gallo and Eccles placed Plaintiff in the holding tank, Plaintiff said, "hey, don't forget my cuffs.  They're really tight." (Doc. 82-2, Pl. Dep. 49:11–14, 49:17–24.)  Defendants Gallo and Eccles responded, "okay, we'll be back," and Plaintiff was left in the holding tank.  (*Id.* 49:15–16.)

Shortly before the 10:00 a.m. sentencing hearing, Defendants Gallo and Eccles returned to the holding tank to escort Plaintiff to see his attorney, who had requested to see Plaintiff.  (*Id.* 53:12–20.)  Plaintiff said to the Defendants, "Hey, you guys forgot about me.  Man, my cuffs are still tight."  (*Id.* 53:20–22.)  Defendants Gallo and Eccles responded, "Well, we have so many things to do right now, and your lawyer wants to talk to you."  (*Id.* 55:2–4.)  Defendants did not check Plaintiff handcuffs at that time.  (*Id.* 55:17–19.)

When Plaintiff met with his attorney, the attorney noticed the handcuffs, which "seemed to be extremely tight," and the attorney commented that they looked very tight. (*Id.* 57:20–58:1; Doc. 82-2 at 4, Mendoza Dep. 23:6–7.)  Plaintiff told his attorney that he had been asking for officers to loosen the cuffs, and that, although they said they were going to do so, they hadn't done it so far.  (Doc. 82-1 at 14, Pl. Dep. 58:1–4.)  Plaintiff's attorney asked one of the Defendants to check Plaintiff's handcuffs and said "is there any way to, you know, loosen up around his wrists at all?"  (*Id.* 58:4–6; Doc. 82-2 at 9, Mendoza Dep. 30:7–10.)  Defendants responded that they would not or could not, and Defendants did not inspect the handcuffs, slide them down, or put a finger under the

handcuff to test the tightness.  (Doc. 82-2, Mendoza Dep. 30:11–12, 34:10–13; Doc. 82-2 at 17, Pl. Decl. ¶ 10.)[4]

At the hearing, Plaintiff was sentenced to 13.5 years in prison.  (Doc. 73 ¶ 19; Doc. 82 ¶ 19.)  Plaintiff was shocked at the sentence he received and was angry at himself, but realized there was nothing he could have done; he just wished he could have done things differently.  (Doc. 73-2, Pl. Dep. 62:1–8.)  Defendants Eccles and Gallo were present for the hearing and state they witnessed Plaintiff's demeanor change and saw that he became angry and upset.  (Doc. 73 at 21.)  Plaintiff's attorney testified that he would not characterize Plaintiff as being upset after the hearing.  (Doc. 82-2 at 12, Mendoza Dep. 46:8–12.)

The hearing concluded around 11:00 a.m. and Defendants Gallo and Eccles escorted Plaintiff from the courtroom to the elevator.  (Doc. 73 ¶ 22; Doc. 82 ¶ 22.)  While they were in the elevator, Plaintiff said to Defendants officers, "hey, please make sure you guys loosen my cuffs before you transport me back."  (Doc. 82-1 at 18, Pl. Dep. 65:25–66:2.)  Defendants did not say anything in response.  (*Id.* 66:2–3.)

When they exited the elevator and were in the hallway that led to the Brown Mile— the covered outdoor hallway connecting the courthouse to the transportation sally port area—Plaintiff said to Defendants officers, "I'm going to sit here to talk to your supervisor regarding loosening my cuffs."  (*Id.* 66:4–17.)  There was a chair in the hallway and Plaintiff said if you guys don't want to loosen my cuffs, I'm going to sit right here and wait for your supervisor to explain to me why you don't want to loosen my cuffs."  (*Id.* 66:20–24.)  Plaintiff testified that he tried to sit down on the chair, but before he sat down he was grabbed by Defendants on either side and dragged out of the chair.  (*Id.* 68:11–16.)[5]

---

[4] Defendants assert that, upon the attorney's request to loosen the handcuffs, Defendant Gallo and Eccles shimmied the handcuffs down because they were too high on Plaintiff's wrist, and Defendant Gallo inserted his pinkly finger between Plaintiff's wrist and the handcuffs to confirm they were not too tight.  (Doc. 73 ¶¶ 16, 18.)

[5] Defendants assert that Plaintiff abruptly sat on the chair, demanded a supervisor, and said he would not move until the black box was removed.  (Doc. 73 25–26.)

Plaintiff testified that Defendants said, "you got to go . . . You're going back to where you came from . . . You got to go.  It don't matter.  We're not speaking to the supervisor . . . We have got other things to worry about.  We have to go." (Doc. 82-1 at 22, Pl. Dep. 71:8–13.)[6]

Defendant Lizarranga and Officer Abraham joined Eccles and Gallo to assist in escorting Plaintiff to the transportation sally port.  (Doc. 73 ¶¶ 27–28; Doc. 82 ¶¶ 27–28.)  Defendant Gallo was on Plaintiff's left side, Defendant Eccles on his right side, and Defendant Lizarranga following immediately behind, with all three officers holding Plaintiff.  (Doc. 73 ¶ 29; Doc. 82 ¶ 29; Doc. 73-2, Ex. 4, Attach. B, Video 2, 12:27:08-12:27:15.)  The group exited a door from the courthouse and entered the Brown Mile.  (Doc. 73-2, Ex. 4, Attach. B, Video 2, 12:27:08.)  While walking down the Brown Mile, Plaintiff was handcuffed in the front and carrying papers in his hands.  (*Id.*, 12:27:10.)[7]  After walking about 10 or 15 yards, Plaintiff suddenly lifted both legs in front of him in an apparent attempt to sit down on the ground.  (*Id.*, 12:27:10–12:27:11.)  Plaintiff did not sit because Defendants on either side held him and stood him back on his feet.  (*Id.* 12:27:12–12:27:14.)  Plaintiff dropped the papers he was holding, and Defendants pushed him against the left side wall.  (*Id.* 12:27:15–12:27:16.)  Defendant Lizarranga delivered a quick knee strike to Plaintiff's back side.  (Doc. 73-2, Ex. 4, Attach. B, Video 1, 12:27:12–14.)  Plaintiff avers Defendant Lizarranga kneed him in the back.  (Doc. 82 ¶ 32.)[8]  The group

---

[6] Defendants assert that Gallo and Eccles attempted to contact a supervisor, but none was available.  (Doc. 73 26.)

[7] Defendant Gallo averred that, during the escort through the Brown Mile, he observed Plaintiff's restraints, including the handcuffs, and they were not too tight.  (Doc. 73-2 at 36, Gallo Decl. ¶ 19.)  But the video of the escort through the Brown Mile shows that Gallo did not look down at Plaintiff's handcuffs.  (Doc. 73-2, Ex. 4, Attach. B, Video 2, 12:27; 09-12:27:15.)  Even if Defendant Gallo had looked down, the papers Plaintiff was holding blocked any view that Gallo would have had.  (*Id.*)

[8] Defendants assert that Defendant Lizarranga delivered the knee strike to the common peroneal area (just below the knee) of Plaintiff's right leg.  (Doc. 73 ¶ 34.)  Given the video angles and the positions of Defendants officers, it cannot be seen exactly where Defendant Lizarranga struck Plaintiff, but the strike appeared to be well below Plaintiff's waist.  (Doc. 73-2, Ex. 4, Attach. B, Video 2, 12:27:14; Video 3, 12:27:14.)

then continued the escort of Plaintiff out the hallway door to the sally port and Plaintiff was placed in the transport vehicle.  (Doc. 73-2, Ex. 4, Attach. B, Video 3, 12:27:15–12:27:26; Video 6, 12:27:26–12:27:38.)

Plaintiff was in his restraints and was secured by a seatbelt and shoulder strap, all of which severely limited his movement.  (Doc. 82 ¶ 39.)[9]  Once in the vehicle, Plaintiff saw blood on his hand and realized that his head was bleeding after being pushed against the wall.  (*Id.* ¶ 38.)  His back was also hurting.  (*Id.*)  Plaintiff repeatedly asked Defendants if he could speak to the supervisor before they departed, but Defendants did not respond to his requests.  (*Id.*)  Plaintiff then told Defendant that he needed medical because his head and back were hurting.  (*Id.*)  At that point, Defendants made a U-turn and returned to the sally port.  (*Id.*)  Defendant Eccles initiated an Incident Command System (ICS) to request additional staff assistance when they arrived back at the sally port.  (Dc. 73 ¶ 40.)  The ICS call advised that there was a combative prisoner in the vehicle.  (*Id.* ¶ 42; Doc. 83 ¶ 42.)

When they arrived at the sally port, Defendants exited the vehicle and Lieutenant York approached Plaintiff's side of the vehicle.  (Doc. 83 ¶ 45.)  Lieutenant York introduced himself and Plaintiff asked if he could talk to him.  (*Id.*)[10]  York responded, "I don't give a shit what you have to say.  Get out of the car and do what I tell you."  (*Id.*)  Plaintiff said "okay" and complied with York's directives.  (*Id.*)

Lieutenant York directed officers to apply a WRAP device, which is a system of restraint that limits a person's capacity to harm himself or others.  (Doc. 83 ¶¶ 50, 52.)  As Plaintiff exited the vehicle, he was not yelling or making any noise.  (Doc. 73-2, Ex. 6, Attach. B, Handheld Video, 0:05–0:25.)  There were at least eight officers or more

---

[9] Defendants assert that Plaintiff laid down in the seat, face up, and began kicking the rear driver side door and punching the vehicle's window.  (Doc. 73 ¶ 39.)  Plaintiff denies that he was laying down in the seat, kicking the door, or punching the window.  (Doc. 82 ¶ 39.)  There is no video from the vehicle.

[10] Defendants assert that, as Lieutenant York approached the vehicle, he heard Plaintiff yelling and saw Plaintiff kicking the door.  (Doc. 72 ¶ 45.)  Defendants assert that York attempted to speak to Plaintiff, but Plaintiff continued to yell and refused to comply with York's directives to stop his combative behavior.  (*Id.* ¶ 46.)  Plaintiff denies that he was yelling or combative or refused to comply with directives.  (Doc. 83 ¶¶ 45–46.)

surrounding Plaintiff as he stepped out of the vehicle.  (*Id.*)[11]  Plaintiff took a few steps and went to his knees on what appears to be the WRAP device.  He can be heard asking about his hands and saying, "that's all I was asking . . . this thing is killing my hand . . . look at it . . . that's all I'm asking."  (*Id.*, 0:40–0:58.)  Plaintiff remained passively sitting on his knees while officers surrounded him, and one officer worked on the restraints and removed the handcuffs from the chain connected to Plaintiff's feet.  (*Id.*, 0:58–1:57.)  Plaintiff then followed directives to lay down on his stomach with his hands—which were still cuffed— above his head.  (*Id.*, 1:59–2:05.)  Plaintiff raised his head sightly to ask for a nurse to check his head.  (*Id.* 2:05–2:09.)  An officer kneeled by Plaintiff and placed his hand on Plaintiff's head to hold it steady.  Plaintiff's head was turned so his right cheek was on the cement.  (*Id.*, 2:07–2:11.)

Six or seven officers surrounded Plaintiff and began working to apply the WRAP restraint device.  (*Id.*, 2:11–2:20.)  Defendant Adams stood over Plaintiff and held his taser on Plaintiff's left shoulder.  (*Id.* 2:20.)  Plaintiff was laying still, although his buttocks rocked slightly as officers manipulated his legs.  (*Id.*, 2:15–2:22.)  During this time, no officers were giving any commands or directives.  (*Id.*, 2:22–2:29.)  Plaintiff remained still, not moving his head, and not saying anything.  (*Id.*)

Suddenly, Defendant Adams deployed the taser in drive-stun mode to Plaintiff's shoulder.  (*Id.*, 2:33–2:34.)[12]  Plaintiff's body jolted up in response and he let out a loud wail.  (*Id.*, 2:34–2:36.)  The electric shock caused Plaintiff to urinate on himself.  (Doc. 82-

---

[11] The handheld video only shows officers from their waist down as they are standing, and then shows Plaintiff when he kneels and lays on his stomach.  (Doc. 73-2, Ex. 6, Attach. B. Handheld Video.)  Defendants submitted video footage from the sally port area when Plaintiff was placed in the vehicle, but they did not submit video footage from the sally port when the vehicle returned.  (*See* Doc. 73-2, Ex. 6, Attach. B, Video 4.)

[12] Defendants assert that, once on his stomach, Plaintiff was directed not to move, but "in defiance of officers' orders and without warning Plaintiff then slammed his head into the concrete ground" and engaged in "self-injurious behavior."  (Doc. 73 ¶¶ 55–57.)  Defendants assertions are contradicted by the video and therefore are not considered in the summary judgment analysis.  *See Scott*, 550 U.S. at 380 (stating that, when one party's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

1 at 35, Pl. Dep. 90:19–20.)  Officers held Plaintiff down and he laid still while crying out "why don't you just kill me!"  (Doc. 73-2, Ex. 6, Attach. B, Handheld Video, 2:41–3:30.)  Officers completed applying the WRAP restraint, during which time Plaintiff appeared passive and compliant and continued to moan and cry occasionally.  (*Id.*, 3:00–7:00.)  Medical personal arrived and asked about Plaintiff's head and tried to take Plaintiff's blood pressure.  (*Id.*, 6:55–7:20.)  Officers then lifted Plaintiff into the vehicle.  (*Id.*, 7:28–7:46.)

Upon arrival at the RRCC, photographs of Plaintiff were taken.  (Doc. 73 ¶ 63; Doc. 82 ¶ 63.)  The photographs show a protruding bump, slightly larger than a quarter, on the front of Plaintiff's forehead.  (Doc. 73-2 at 72.)  There was also a scrape on the left side of his head above his temple that appears to have been bleeding.  (*Id.* at 74.)  There is a photograph of Plaintiff's left forearm, which shows numerous red marks around his wrist.  (*Id.* ¶ 76.)  Plaintiff was seen by Nurse Schlig, who documented a swollen left wrist, swollen left shoulder, protrusion on his forehead, and an abrasion on the left side of his face.  (82-3 at 48.)  Plaintiff was given ice and ibuprofen and was sent back to his housing unit.  (Doc. 73 ¶ 65; Doc. 82 ¶ 65.)

Two days later, on July 28, 2021, Plaintiff was seen by Nurse Beck for complaints of headaches, blurry vision, and severe back pain from injuries sustained on July 26, 2021.  (Doc. 82 ¶ 65.2; Doc. 82-3 at 43.)  Plaintiff reported that his headache had stopped but his vision was blurry, his neck was very sore, and his back was hurting from being kneed in the spine.  (Doc. 82-3 at 46.)  Nurse Beck noted bruising on Plaintiff's forehead, "alteration in comfort, R/T headaches, and blurred vision."  (*Id.* at 47–48.)  Plaintiff was given a four-day supply of Tylenol and scheduled to see a provider.  (*Id.*)

Plaintiff still has a scar on his wrist from the tight handcuffs.  (Doc. 82-1 at 38, Pl. Dep. 97:16-23.)

## IV.   Excessive Force Standard

Use of excessive force against a prisoner violates the prisoner's Eighth Amendment right to be free from cruel unusual punishment.  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).  The use of force is constitutional if it is used in a good faith effort to keep or restore

discipline, but unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). Not "every malevolent touch by a prison guard gives rise to a federal cause of action" – de minimis uses of physical force, if not "repugnant to the conscience of mankind," do not offend the Constitution. *Hudson v. McMillan*, 503 U.S. 1, 9–10 (1992).

A court considers five factors in determining whether a defendant's use of force was malicious and sadistic for the purpose of causing harm: (1) the extent of the injury, (2) the need for force, (3) the relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force. *Id.* at 7 (citing *Whitley*, 475 U.S. at 321). When reviewing these factors, the court must remember that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321–22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

Excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Therefore, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.*

## V. Tight Handcuffing Claim Against Gallo and Eccles

### A. Extent of Injury

The extent of a prisoner's injury may suggest whether force used could plausibly have been thought necessary in a particular situation. *Hudson*, 503 U.S. at 7. "The extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Although the extent of a prisoner's injury is relevant, it is not decisive because a prisoner can state a claim even if he did not suffer a significant injury. *See id.* at 38; *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (noting the

attack need not result in permanent injury). Injury and force "are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38.

Defendants argue that Plaintiff's injury consisted of temporary red markings and mild swelling around his wrists and forearm during the brief few hours he was in restraints. They maintain that these injures are not severe enough to support an Eighth Amendment claim.  (Doc. 72 at 10.)[13]  Plaintiff contends that the tight handcuffing caused serious swelling of his left wrist and permanent scarring.  (Doc. 83 at 16.)

Plaintiff alleges that from the time he was handcuffed and placed in the transport van, he continuously complained the handcuffs were too tight.  The video evidence shows that over four hours later he continued to complain that they were too tight and informed officers that the handcuffs were "killing" his hand.  (Doc. 82 ¶ 6; Doc. 73-2, Ex. 6, Attach. B, Handheld Video 0:40–0:58.)  Medical records show that Plaintiff's wrist was not just swollen while he was wearing the tight handcuffs, but was still swollen after he returned to the RRCC.  (82-3 at 48.)  And Plaintiff suffered a scar on his wrist from the tight handcuffing.  (Doc. 82-1 at 38, Pl. Dep. 97:16-23.)  Plaintiff has personal knowledge of his non-visible injury in the form of pain.  Unnecessary pain can be sufficient to support a claim that excessively tight handcuffing constitutes excessive force.  *See Thompson v. Lake*, 607 F. App'x 624, 625 (9th Cir. 2015).  Plaintiff's evidence is sufficient to establish a triable dispute of fact regarding the extent of his injuries.

### B.     Need for Force, Relationship Between Need for Force and Force Used, Threat Reasonably Perceived

The Ninth Circuit has held that "the force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the [excessive force determination]."  *Alexander v. City and Cnty. of S.F.*, 29 F.3d 1355, 1367 (9th Cir. 1994), *abrogated on other grounds by Cnty. of L.A. v. Mendez*, 581 U.S. 420 (2017).  Prison

---

[13] Defendants argue that any injury Plaintiff suffered was de minimis.  (Doc. 87 at 3.)  Under the Eighth Amendment, however, the relevant inquiry is not whether Plaintiff's *injuries* were de minimis, but whether the *use of force* was de minimis. *See Wilkins*, 559 U.S. at 38–39 & n.4.

officials may use force only in proportion to the need in each situation.  *See Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) ("The infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self defense[.]").  In analyzing the relationship between the need for force and the force used, a simple overreaction by an officer is not enough to establish an Eighth Amendment violation. "[O]bduracy and wantonness, not inadvertence or error in good faith, . . . characterize the conduct prohibited by the" Eighth Amendment. *Whitley*, 475 U.S. at 319.

Defendants contend that the handcuffs were properly applied; Plaintiff manipulated the cuffs and caused them to tighten; and when Plaintiff requested adjustments, Defendants moved the handcuffs back to Plaintiff's wrists after they had moved up.  (Doc. 72 at 11; Doc. 87 at 5; Doc. 73 ¶ 16.)  Defendants further contend that the restraints used to transport Plaintiff were consistent with accepted corrections and law enforcement policies and practices.  (Doc. 72 at 10.)

Plaintiff does not dispute that a prisoner traveling to and from the courthouse may be restrained with a combination of handcuffs, leg shackles, and a waist chain.  (Doc. 82 ¶ 71.)  He argues, however, that there was no need for excessively tight handcuffs or for refusing to check the handcuffs and loosen them.  (Doc. 83 at 16.)

The fact that restraints are standard practice has no bearing on whether Plaintiff's handcuffs were excessively tight.  *See Thompson*, 607 F. App'x at 625–26 (internal citation omitted) ("the mere fact that '[h]andcuffing an arrestee is standard practice, everywhere,' has no bearing on whether an arrestees handcuffs are excessively tight").  The Court must take as true Plaintiff's allegations that the handcuffs were too tight, Defendants never moved them down because they were too high on his arm, and the handcuffs were like a rubber band around his wrist and were so tight that he couldn't slide them up or down his wrist.  (Doc. 82 ¶¶ 6, 16; Doc. 82-1 at 3, 7, 16, Pl. Dep. 45:1–2, 49:14, 64:12–15; Doc. 82-2 at 6, 8, Mendoza Dep. 25:19–21, 29:20–22.)  The record shows that Plaintiff was subjected to tight handcuffing from 8:00 a.m., when he departed the RRCC, to

approximately 12:30 p.m., when he was placed in the WRAP device.  (Doc. 73 ¶¶ 3–4: Doc. 73-2, Ex. 4, Attach. B, Video 2, 12:27 p.m. time stamp.)  Plaintiff alleges that he complained to Defendants Gallo and Eccles and asked them to loosen the handcuffs in the van on the way to the courthouse, when they placed him in the holding tank, when he met with his lawyer, and when he was in the elevator after the sentencing.  Plaintiff requested a supervisor to address why they would not loosen the handcuffs, but Defendants Gallo and Eccles never checked or loosened them.  Tight handcuffing for 4.5 hours, while Plaintiff repeatedly complained, suggests the force was not de minimis.  *See Buckley v. Evans*, No 2:02-cv-01451-JKS2007 WL 2900173, at *8 (E.D. Cal. 2007) (finding that tight handcuffing was more than de minimis force where prisoner was kept in handcuffs and leg irons for almost five hours and they were not loosened when he constantly complained).

The Court must also consider "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Hudson*, 475 U.S. at 321.  Defendants do not argue that there was any particular threat that warranted tight handcuffs. (*See* Doc. 72 at 10–11.)  Nor do Defendants argue that they perceived a threat that prevented them from checking and loosening Plaintiff's handcuffs for more than over four hours. (*See id.*)  It would not have been reasonable to perceive a threat when Plaintiff was handcuffed, in leg restraints and a belly chain, and in the custody of multiple officers.  This was a controlled transport of a single prisoner as part of the normal course of prison and courthouse operations.  Defendants were not addressing a prison riot or other heightened security situation that would require a level of force beyond that normally used when handcuffing and moving prisoners.  *See Pewitte v. Haycraft*, No. 3-13-0484, 2015 WL 5038026, at *6–7 (M.D. Tenn. Aug. 25, 2015) (finding a genuine issue of material fact as to both the subjective and objective components of prisoner's Eight Amendment claim where the plaintiff testified that officers persistently ignored his complaints of pain caused by the tightness of handcuffs, and noting that, while prison guards have wide-ranging discretion to apply force to maintain security, proof that guards ignored multiple complaints during a controlled transport raised a question whether

they left the handcuffs tight in a good faith effort to maintain discipline or with malicious and sadistic intent).

A reasonable jury could find that Defendants Gallo and Eccles' conduct of deliberately refusing to check and loosen Plaintiff's cuffs, over a period of 4.5 hours, while Plaintiff repeatedly complained, was not merely inadvertent or negligent but exhibited obduracy and wantonness. Accordingly, there exists a genuine issue of material fact whether the force used was necessary to maintain discipline or was malicious and intended to cause harm. The Court will deny summary judgment on the excessive force claim related to tight handcuffing against Defendants Gallo and Eccles.

## VI.    Claim of Excessive Force in the Brown Mile

### A.    Extent of Injury

Defendants contend that Plaintiff suffered no injury when Defendants Gallo and Eccles pushed him against the wall in the Brown Mile and that, apart from Plaintiff's claim that his back hurt, there is no evidence Plaintiff suffered any injury as a result of Defendant Lizarranga's knee strike. (Doc. 72 at 11.) Defendants maintain that the injury to Plaintiff's forehead was the result of him slamming his head into the pavement just before he was tased in stun-gun mode, not from being pushed up against the wall. (Doc. 87 at 7.)

The Court must take as true Plaintiff's claims that he suffered pain and injury to his back as a result of Defendant Lizarranga' knee strike and that he first noticed blood from a head injury when he was in the transport car after the incident on the Brown Mile. The Handheld Video shows that Plaintiff asked for a nurse to check his head after was removed from the transport car – before he allegedly slammed his head into the pavement – supporting that he had a head injury before he was tazed. (Doc. 73-2, Ex. 6, Attach. B, Handheld Video, 2:05–2:09.) More importantly, and contrary to Defendants' insistence, the video does not show Plaintiff slamming his head into the pavement prior to deployment of the taser. When he first laid down, Plaintiff placed his right cheek on the pavement. (*Id.*, 1:59–2:00.) He lifted his head slightly and turned it towards the left to ask for a nurse, and then placed his head back down on his right cheek. (*Id.*, 2:05–2:09.) Plaintiff did not

move his head again until after he was shocked with the taser.  (*Id.*, 2:09–2:34.)  Even though Plaintiff's bodily reaction to the electric shock caused his back to arch and his head to come up off the pavement, officers appeared to grab or hold his head so that it did not slam down into the pavement.  (*Id.*, 2:34–2:40.)  There is nothing on the Handheld Video to support Defendants' claim that Plaintiff slammed his head and received his forehead or left temple injury while lying on the pavement.

The video from the Brown Mile – slowed to frame-by-frame – shows that when Defendants Gallo and Eccles pushed Plaintiff against the wall his head was the first part of his body to hit the wall.  This could be the cause for either the forehead or left temple injury.  (Doc. 72-3, Ex. 4, Attach. B, Video 2, 12:27:13–15.)  It then appears that Plaintiff's head is against the wall turned to the right, so that his left cheek is against the wall.  (*Id.*, 2:214–16.)

Based on the video and Plaintiff's testimony, a reasonable jury could conclude that Plaintiff's head injuries were caused by being pushed against the wall in the Brown Mile, and that he suffered pain and injury to his back from Defendant Lizarranga's knee strike.

### B.    Need for Force, Relationship Between Need for Force and Amount of Forced Used, Threat Perceived

Defendants argue that there was a need for force in response to Plaintiff's actions when he jumped and attempted to sit on the ground.  (Doc. 72 at 11.)  Defendants contend that Defendants Gallo and Eccles did not slam Plaintiff against the wall, but placed him against the wall to restore discipline and ensure the safety of Plaintiff and the officers.  (*Id.*)  Plaintiff asserts that Defendants Gallo and Eccles "slammed" him against the wall "really, really hard."  (Doc. 83 at 9.)

The video of this incident shows that when Plaintiff lifted both legs and tried to sit down, Defendants Gallo and Eccles – holding him from either side – kept him from sitting down, pulled him up, and turned him toward the wall on Plaintiff's left.  (Doc. 73-2, Ex. 4, Attach. B, Video 1, 12:27:10-12:27:11.)  Plaintiff was leaning forward, and the video shows that pushing him into the wall forced him to stand up straight.  (*Id.*, 12:27:12-

12:27:14.)  The video does not support Plaintiff's claim that he was "slammed" into the wall "really hard."  The video shows that Defendants Gallo and Eccles moved Plaintiff to the wall and pushed him into it to stand him up in response to his attempt to sit on the ground during the escort.  (*Id.*)  Defendants' use of force was a reasonable response to Plaintiff's actions.  No reasonable jury could view the video of this incident and find that Defendants Gallo and Eccles acted maliciously and sadistically.

Defendant Lizarranga's knee strike came as Defendants Gallo and Eccles pushed Plaintiff against the wall.  Defendants argue the knee strike was necessary to gain control of Plaintiff, who posed a threat to the safety of officers and others he may have encountered if he broke free of the escort.  (Doc. 72 at 12.)  Defendants claim that these "great risks," including potential escape, made the knee strike a reasonable use of force.  (*Id.*)  Plaintiff argues that he was already pushed against the wall and not a threat when Defendant Lizarranga delivered the knee strike.  (Doc. 83 at 9.)  Plaintiff avers that, prior to the knee strike, neither Lizarranga nor the other officers gave any commands to cease his behavior or stop resisting.  (*Id.*)

From Plaintiff's facts, the inference can be made that no commands were given to cease resisting because, by the time he was up against the wall, he was no longer resisting, which arguably would mean that further use of force were unnecessary.  But the video shows that there was less than a second between the time Defendants Gallo and Eccles moved Plaintiff to the wall and Lizarranga kneed Plaintiff, hardly time to issue commands.  (Doc. 73-2, Ex. 4, Attach. B, Video 2, 12:27:14.)  The video suggests that the knee strike was used to get Plaintiff to stand up straight to continue the escort. (*Id.*)

This was a situation where Plaintiff took actions to stop the escort and Defendant Lizarranga, in responding instantly to Plaintiff's conduct, had to make the immediate decision of whether to use force and, if so, how much.  Even if one could conclude that Lizarranga used more force than necessary – a conclusion that is not obvious from the video – such force does not evidence a constitutional violation.  *See Madrid v. Gomez*, 889 F. Supp. 1146, 1166 (N.D. Cal. 1995) ("[t]here are certainly instances where, in the heat

- 17 -

of the moment, officers may use more force than intended.  Such a case would suggest that the officers did not act with punishment in mind").  The Eighth Amendment does not prohibit uses of force that appear unreasonable in hindsight, as long as officers were acting in good faith and for a legitimate end.  *See Whitley*, 75 U.S. at 322.  On this record, it was reasonable for Defendant Lizarranga to perceive some threat when Plaintiff raised both legs and suddenly tried to sit down to stop the escort, and Lizarranga's immediate response of kneeing Plaintiff in the back of the leg when he was against the wall but still leaning was consistent with trying to preserve order and stop further disruptions.  *See Hudson*, 503 U.S. at 6.  The facts do not support a finding that Defendant Lizarranga used force maliciously and sadistically for the purpose of causing harm.

In short, the *Hudson* factors favor Defendants Gallo, Eccles, and Lizarranga on the excessive force claim for actions taken during escort in the Brown Mile.  Summary judgment will be granted to these Defendants on this portion of the excessive force claim.

## VII.   Taser Stun Claim Against Defendant Adams

### A.   Extent of Injury

Defendants explain that application of a taser in drive-stun mode involves placing the fore end of the device on the subject's body and activating the device with a trigger press, which causes a mild electrical current to pass between the two electrodes on the end of the device.  (Doc. 72 at 14.)  According to Defendants, when deployed in drive-stun mode, there is no neuromuscular incapacitation.  (*Id.*)

Courts have recognized that a taser deployed in drive-stun mode can cause extreme pain.  *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (noting "the magnitude of the electric shock at issue and the extreme pain that [the plaintiff] experienced" from being subjected to a taser in drive-stun mode): *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009) (noting that a woman who was tased in drive-stun mode experienced "extreme pain" and "felt a sharp pain where the Taser met her arm, with the pain radiating from her upper arm and causing her muscles to clench").  Plaintiff asserts that use of the taser on his shoulder resulted in screams of pain.  (Doc. 83 at 15.)  The video shows Plaintiff

writhe in pain and let out a loud cry after being shocked.  (Doc. 73-2, Ex.6, Attach. B, Handheld Video, 2:34-2:36.)  The shock was strong enough to cause Plaintiff to urinate on himself.  (Doc. 82-1 at 35, Pl. Dep. 90:19–20.)  The proffered medical records show that Plaintiff's left shoulder was swollen after the incident.  (Doc. 82-3 at 48.)  This evidence would support a conclusion that Plaintiff's injury that was more than insignificant, and the first *Hudson* factor favors Plaintiff.

### B. Need for Force, Relationship Between Need for Force and Amount of Forced Used, Threat Perceived

The parties dispute whether Plaintiff posed any threat to himself or others and whether there was any need for force.  Defendants claim force was needed because Plaintiff was banging his head on the cement that "could have resulted in significant injury or even death."  (Doc. 72 at 13.)  Defendant Adams avers that he was aware Plaintiff "had been self-harming and combative while inside the transportation vehicle."  (Doc. 73-2 at 145, Adams Decl. ¶ 16.)  Defendant Adams further avers that, after Plaintiff was placed on his stomach, "he was directed not to move as his hands were taken out of restraints," suggesting that Plaintiff may have posed a threat with his hands out of restraints, and Adams states that Plaintiff then slammed his head into the concrete.  (*Id.* ¶¶ 14–15.)

Although the Court takes as true Plaintiff's allegation that he was not self-harming or combative while in the transport vehicle, Defendant Adams could have believed other officers' reports to the contrary.  Nonetheless, the video shows that when Defendant Adams deployed the taser, Plaintiff was lying on his stomach, not moving, and surrounded by at least 7 or 8 officers.  (Doc. 73-2, Ex. 6, Attach. B, Handheld Video, 2:30–2:34.)  The video also shows that Plaintiff never banged his head on the cement before Defendant Adams tazed him.  (*Id.*, 2:12–2:32.)  Plaintiff's hands remained cuffed when the chain connecting the handcuffs to Plaintiff's leg restraints was removed, and when he laid down on his stomach his hands were cuffed above his head.  (*Id.*, 1:20–1:59.)  The video also shows that the situation was not "tense, uncertain, and rapidly evolving" such that Defendant Adams was "forced to make [a] split-second judgment" whether to apply force in the

moment. *Graham*, 490 U.S. at 397. Rather, Plaintiff complied with commands when he exited the transport vehicle, went to his knees, and then went to his stomach. (Doc. 73-2, Ex. 6, Attach. B, Handheld Video, 0:26–1:58.) Plaintiff laid on the ground, with his hands cuffed above his head, for over 20 seconds before Defendant Adams suddenly deployed the taser. (*Id.*, 2:06–2:32.)

Prison officials may use force only in proportion to the need in each situation. *See Spain*, 600 F.2d at 195. A reasonable jury could determine that Plaintiff did not pose any threat, there was no need to use the taser, and Defendant Adams' action was vastly disproportional to the need. These *Hudson* factors weigh in Plaintiff's favor.

### C.    Efforts to Temper Force

Defendants argue that Defendant Adams tempered the severity of his response by using only a "very brief" drive-stun application of less than two seconds. (Doc. 87 at 8.) But this final factor considers whether there were any efforts to temper force *before* the use of force at issue. Plaintiff's allegations that he remained handcuffed, on his stomach, secured and surrounded by numerous officers, which is confirmed by the video, suggests that Defendant Adams made no effect to temper force and that the force was used to cause Plaintiff harm. This final factor favors Plaintiff.

In sum, there are genuine issues of material fact whether Defendant Adams used force in a good faith effort to maintain discipline or for the purpose of causing harm in violation of the Eighth Amendment. Summary judgment on the excessive force claim against Defendant Adams will therefore be denied.

### VIII.  Qualified Immunity

Defendants assert that Gallo, Eccles, and Adams are entitled to qualified immunity. (Doc. 72 at 18.) Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that

1  right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S.

2  223, 230–32, 235–36 (2009) (courts may address either prong first depending on the

3  circumstances in the particular case).  In the qualified immunity analysis, the court must

4  consider all disputed facts in the light most favorable to the nonmovant.  *Isayeva v.*

5  *Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

6          The Court has already determined there are triable issues of fact on whether Gallo

7  and Eccles' refusal to loosen the handcuffs and Adams' use of the taser violated Plaintiff's

8  Eighth Amendment rights.  Qualified immunity therefore turns on the second prong –

9  whether the rights at issue were clearly established such that these Defendants would have

10  known their conduct was unlawful.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

11         For a right to be clearly established there does not need to be a case directly on point,

12  but "existing precedent must have placed the statutory or constitutional question beyond

13  debate."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12

14  (2017)).  Clearly established law "must be particularized to the facts of the case" and

15  "should not be defined at a high level of generality."  *White*, 580 U.S. at79 (quotation and

16  citation omitted).  A right is clearly established when case law has been "earlier developed

17  in such a concrete and factually defined context to make it obvious to all reasonable

18  government actors, in the defendant's place, that what he is doing violates federal law."

19  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 580

20  U.S. at 78–79).  "The Supreme Court has made clear that 'officials can still be on notice

21  that their conduct violates established law even in novel factual circumstances.'"  *Mattos*,

22  661 F.3d at 442 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  The question of

23  whether a prison official's conduct was reasonable in light of clearly established law is a

24  "fact specific inquiry."  *Castro v. Cnty. of L.A.*, 797 F.3d 654, 688–69 (9th Cir. 2017.)

25  "[T]he defendant's subjective understanding of the constitutionality of his or her conduct

26  is irrelevant."  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011)

27  (internal quotation marks and omitted).

28

1  Defendants' argument on this prong, in its entirety, is that "there is no case law to
2  suggest that Defendants violated a clearly established right." (Doc. 72 at 18.)  Plaintiff
3  responds that by 2018 it was well established "that use of more than de minimis force
4  'maliciously and sadistically for the purpose of causing harm' violates the Eighth
5  Amendment." (Doc. 83 at 17, citing *Rodriquez v. Cnty. of L.A.*, 891 F.3d 779, 796 (9th
6  Cir. 2018).)  Plaintiff further argues that, as to the use of a taser in drive-stun mode, the
7  Ninth Circuit has held that use of such force "on a person who 'actively resisted arrest,'
8  but posed no 'immediate threat to the safety of the officers or others' constituted excessive
9  force." (*Id.* at 17–18, citing *Bonivert v. City of Clarkson*, 883 F.3d 865, 872–73 (9th Cir.
10  2018), and *Mattos*, 661 F.3d at 445–46.)

11  Defendants maintain that *Bonivert* and *Mattos* are not relevant because both were
12  Fourth Amendment cases and neither held that officers are prohibited "from deploying a
13  taser in drive-stun mode for less than two seconds to prevent a sentenced inmate from
14  continued to self-harm and/or injure others." (Doc. 87 at 11.)  But this argument improperly
15  rests on Defendants' version of the facts.  "[W]here the [officer's] entitlement to qualified
16  immunity depends on the resolution of disputed issues of fact in [his] favor against the non-
17  moving party, summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d
18  949, 956 (9th Cir. 2003).  As noted above, Plaintiff's facts and the video evidence suggest
19  Plaintiff was not engaging in self-harming behavior, did not slam his head on the ground,
20  was not moving, and had his hands cuffed above his head with his legs in a WRAP restraint
21  while surrounded by multiple officers.  A reasonable officer in this situation would know
22  that deploying a taser in drive-stun mode would violate the prisoner's Eighth Amendment
23  rights.  *See Hudson*, 503 U.S. at 5 (the "settled rule" is that "the unnecessary and wanton
24  infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth
25  Amendment") (internal quotation omitted).

26  As to tight handcuffing, the Ninth Circuit and other circuit courts have long
27  recognized that overly tight handcuffing may constitute excessive force, particularly where
28  the handcuffs cause demonstrable injury or unnecessary pain, or when officers ignore or

refuse requests to loosen the handcuffs once alerted that the cuffs are too tight. *See Thompson*, 607 F. App'x at 625–26 (denying qualified immunity when tight handcuffs caused the plaintiff unnecessary pain and he requested police loosen them); *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003) (denying qualified immunity when the plaintiff was kept for 30 minutes in overly tight handcuffs causing her unnecessary pain); *see also Ajala v. Tom*, 658 F. App'x 805, 806-07 (7th Cir. 2016) (reversing qualified immunity dismissal because case law established that use of restraints to inflict pain on prisoners violated the Eighth Amendment). In *Clark v. Flores*, a convicted prisoner alleged that his Eighth Amendment rights were violated during transports in 2020 and 2021, when he was subjected to excessively tight handcuffing and officers disregarded his requests to loosen the handcuffs. No. 5:21-cv-00406-MCS-PD, 2023 WL 4157482, at *1 (C.D. Cal. May 2, 2023.) The district court opined that "it is settled in the Ninth Circuit that excessively tight handcuffs may constitute a constitutional violation." *Id.*, at *9 (citing *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) ("It is well-established that overly tight handcuffing can constitute excessive force"), and *Luchtel v. Hagemann*, 623 F.3d 975, 989 (9th Cir. 2010) (Beezer, J., concurring in part and dissenting in part) ("The right to be free from excessive force in handcuffing is clearly established in our precedent")).

In the facts of this case recited above, a reasonable officer would know that choosing to ignore a prisoner's multiple requests to loosen his handcuffs for no penological purpose would violate the Eighth Amendment.

Defendants Gallo, Eccles, and Adams are not entitled to qualified immunity.

**IX.   Punitive Damages**

Defendants seek summary judgment on Plaintiff punitive damages claim on the ground that there is no evidence Defendants acted with evil motive or reckless indifference to Plaintiff's rights. (Doc. 72 at 18.) Punitive damages are not a separate claim, but a request for relief. Because Plaintiff's excessive force claim related to handcuffing and use of a taser survive summary judgment, his request for punitive damages also survives.

Whether punitive damages are warranted is an issue reserved for the jury. *See Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion"). Here, a reasonable jury could conclude that Gallo, Eccles, and Adams exhibited conduct "shown to be motivated by evil motive or intent, . . . or reckless or callous indifference to the federally protected rights of" Plaintiff. *Id.* at 56. Defendants' request for summary judgment on punitive damages will be denied.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 72.)

(2)    Defendants' Motion for Summary Judgment (Doc. 72) is **granted in part** and **denied in part** as follows: (a) the Motion is **granted** on Plaintiff's excessive force claims against Gallo, Eccles, and Lizarranga related to escort in the Brown Mile; and (b) the Motion is otherwise **denied**.

(3)    Defendant Lizarranga is **dismissed** from this action.

(4)    The remaining claims are Plaintiff's Eighth Amendment excessive force claim against Defendants Gallo and Eccles for tight handcuffing and against Defendant Adams for use of the taser.

(5)    This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference.

(6)    Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Boyle's chambers at (602) 322-7670 within 14 days to schedule a date for the settlement conference.

Dated this 11th day of February, 2025.

David G. Campbell
Senior United States District Judge